**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JAMES J. JUDD, M.D., et al., | |
| Plaintiffs, | Civ. No. 10-4914 (KM) |
| v. | **O P I N I O N** |
| QUEST DIAGNOSTICS INCORPORATED, | |
| Defendant. | |

*Appearances by:*

OBERMAYER REBMANN MAXWELL & HIPPEL LLP
By:    Kimberly D. Sutton, Esq.
Woodland Falls Corporate Park
200 Lake Drive East, Suite 110
Cherry Hill, NJ 08002

        *Attorneys for Plaintiff*

COVINGTON & BURLING LLP
By:    Ethan M. Posner, Esq.
        Michal M. Maya, Esq.
        Matthew Berns, Esq.
1201 Pennsylvania Avenue, NW
Washington, DC 20004

        *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This matter arises out of allegations that Defendant Quest Diagnostics Incorporated ("Quest") engaged in a scheme to induce medical providers, including Hatboro Medical Associates, P.C. ("HMA") and others, through the use of kickbacks, so that those medical providers would refer their patients to Quest for diagnostic testing.

On September 22, 2010, Relator-Plaintiff James Judd, M.D. filed a Complaint setting forth claims under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., as well as multiple state and local false claims acts.  On May 4, 2012, Quest moved to dismiss the Complaint.  On June 4, 2012, Judd opposed the motion and simultaneously filed an Amended Complaint setting forth additional factual allegations in support of his claims and additional claims under state and local false claims acts.

Quest now moves to dismiss the Amended Complaint.  For the reasons set forth below, Quest's motion is DENIED with respect to allegations of false claims submitted by HMA, but GRANTED in all other respects.

## I.      BACKGROUND

 Judd is a licensed medical doctor in the State of Pennsylvania who, since 1988, has practiced medicine as the managing partner and chief executive officer of HMA, a group medical practice, along with four other physicians.  Quest is a diagnostic testing laboratory that has a national network of laboratories in or near all major cities in the United States and "claims to serve fifty percent (50%) of the physicians and hospitals in the United States and over 90 million people covered by health plan and third-party insurers."  (Id. ¶ 22.)

The Amended Complaint alleges that Quest orchestrated a kickback scheme, from 2005 through the present, "to induce licensed professionals, their medical practices and other healthcare providers (herein after collectively referred to as 'Providers') to refer their patients to

Quest for diagnostic testing, through the provision of free medical supplies and discounted testing fees and other remuneration, which disqualifies Quest from participating in the Medicare and Medicaid program and makes it ineligible for reimbursement[.]" (Id. ¶ 23.)  Specifically, "[i]n return for patient referrals, Quest provides laboratory collection supplies," including non-safety needles, "test kits for in-office testing, and other medical and office supplies at no charge and agrees to perform substance abuse testing at discounted rates." (Id. ¶¶ 25, 113.)  "Quest also locks in referral by giving Providers free access to its patient database for purposes of ordering tests and reporting test results." (Id.)

In other words, according to Judd, "Quest has knowingly structured business arrangements with Providers that led and continue to lead Providers to present claims to Medicare and Medicaid and other federal funded health insurance programs that Quest knew" would violate the law.  (Id. ¶ 120.)  "The Providers did, in fact, agree to refer lab work to Quest rather than to other diagnostic laboratories, because, among other things, Quest provided free laboratory collection supplies, test kits for in-office testing, and other medical and office supplies and discounted laboratory testing." (Id. ¶ 27.)

In turn, "Quest . . . caused Providers to submit to the Government [] false claims for (a) reimbursement of blood collection procedures they perform using non-safety needles provided by Quest at no charge, for which part of the reimbursed costs are the reasonable cost of safety needles that comply with" OSHA; and (b) reimbursement of in-office tests they perform using test kits provided by Quest at no charge (including Strep Test Kits and Hemacult Kits), for which part of the reimbursed costs are the reasonable costs of such test kits." (Id. ¶ 33.)

According to the Amended Complaint, "[i]n order to establish a relationship with the Providers and to lock in Medicare and Medicaid patient referrals, Quest structures business

arrangements with Providers, pursuant to which Quest supplies the Provider with medical supplies without charge, installs equipment in their offices without charge, and performs substance abuse testing and other diagnostic laboratory testing for the Providers at discounted rates."  (Id. ¶ 96.)  Moreover, many of these free medical supplies "are not used solely for specimen collection and/or have general office uses . . . , including but not limited to, non-safety needles, Band-Aids, cotton balls, specimen containers as well as in-office diagnostic testing materials, including but not limited to, Strep Test Kits (Kit: Strep A. Osom 50 Test Kit, includes Controls Swap) Hemacult Kits (Hemacult Sensa DispensPak Plus) among other things."  (Id. ¶ 100.)  Judd alleges that "Quest's offer to provide free medical and office supplies, equipment and discounts was an important factor in [his] decision to change laboratory services from Lab Corp to Quest and to refer most of HMA's lab work to Quest and to thereafter maintain HMA's relationship with Quest."  (Id. ¶ 97.)

Judd sets forth a number of instances, from May 29, 2007 to present, where he submitted claims to Medicare for items that he received free of charge from Quest.  First, "HMA submitted approximately 4,950 claims to Medicare under CPT 36415 for in office venipuncture services that were provided to a Medicare patient using blood collection supplies that Quest provided to the HMA without charge, for which [Judd] was reimbursed $3.00 by Medicare."[1]  (Id. ¶ 125.) The Amended Complaint sets forth a number of specific examples of claims that HMA

---

[1] "[Judd's] practice performed approximately 4,950 venipunctures for Medicare and Medicaid patients . . . on a daily basis using needles that Quest provided to [Judd] free of charge, and the associated blood specimens were picked up by Quest, free of charge, approximately two times per day."  (Amend. Compl. ¶ 124.)

electronically submitted to Medicare for these venipuncture services, including the service date, patient ID number,[2] and date and amount of reimbursement from Medicare.[3]  See (id. ¶ 126.)

Second, Judd "submitted approximately 320 claims to Medicare and Medicaid for reimbursement under CPT 82270 for the in-office hemacult testing of Medicare patients using a hemacult test that Quest provided to [Judd] without charge, for which [he] was reimbursed $4.66 by Medicare."  (Id. ¶ 128.)  The Amended Complaint also sets forth examples of these claims, including the service date, patient ID number, and the date and amount of Medicare reimbursement.  See (id. ¶ 129.)

Third, Judd "submitted approximately 18 claims to Medicare 87880QW for in-office streptococcus testing of a Medicare patient using a strep test that Quest provided to [Judd] without charge, and for which [he] was reimbursed $15.77 by Medicare."  (Id. ¶ 130.)  The Amended Complaint sets forth examples of these claims, including the service date, patient ID number, and amount and date of Medicare reimbursement.  See (id. ¶ 131.)

Judd also alleges two instances where Quest provided discounted testing services to HMA.  First, Quest and HMA entered into a written Testing Services Agreement, on May 29, 2007, under which "Quest discounted the prices that HMA was to pay for 80 diagnostic laboratory tests it could order for its private patients."  (Id. ¶ 101.)  "For example, Quest charged HMA $14.00 for a Lipid Panel and the Medicare reimbursement is $18.72 for a lipid panel under

---

[2] Judd redacted the patient ID numbers to protect their privacy under HIPPA.

[3] These claims "were from patients whose blood specimen was delivered by HMA to Quest for diagnostic laboratory testing," and Quest provided results for each test.  (Amend. Compl. ¶ 127.)  "Upon information and belief, Quest provided claims to Medicare for payment of the diagnostic laboratory testing it provided for each of the patients whose [patient ID] was identified on the claims for venipuncture services made by HMA . . . on or about the same date that HMA provided venipuncture services on those patients[.]"  (Id.)

CPT code 80061.  Quest charged HMS $9.00 for a HDL-cholesterol; The Medicare reimbursement is $11.96 for that same test under CPT code 83718."  (Id.)

Second, on June 6, 2007, HMA and Quest entered into a Substance Abuse Testing Agreement, under which HMA and other Providers would be provided "with certain Medical Review Officer services, including but not limited to substance abuse panel services, that offers Providers clinical laboratory testing services at a discounted rate for each test that can be marked up when the Provider seeks reimbursement from the employer."  (Id. ¶ 102.)  "Under the Substance Abuse Testing Agreement, Quest agreed to provide substance abuse testing for HMA's private pay business at discounted prices, which enabled HMA to obtain remuneration in the form of the spread between the price charged by Quest for the diagnostic services and the price HMA charges to its private payers for the diagnostic tests."  (Id. ¶ 103.)

Judd further alleges that Quest provided HMA with free office supplies.  Specifically, on June 25, 2007, Quest and HMA entered into a Subscriber Service Agreement, pursuant to which "Quest delivered computer equipment, printers, a fax machine and computer software, all of which were placed in HMA's offices, without charge to HMA."  (Id. ¶ 106.)  "Quest thereafter supplied HMA with printer supplies, such as paper and toner." [4]  (Id.)

Judd claims that other Providers entered into similar agreements with Quest because "Quest designed and structured the business arrangements between itself and the Providers" using "standard form contracts, order forms, price lists and oral representations to structure such business arrangements with Providers."  (Id. ¶¶ 31, 121.)  Indeed, "Quest presented [Judd] with standardized form agreements that were created or last revised in 6/05."  (Id. ¶ 121.)

---

[4] Judd alleges that Quest provided other Providers with "free fax lines, printers, and printer supplies, such as paper and toner."  (Amend Compl. ¶ 114.)

6

In October 2007, "Judd conducted an investigation into the relationship between HMA and Quest[.]"  (Id. ¶ 16.)  This investigation "included discussions with the nurse manager and phlebotomist and HMA about non-safety needles that were being used at HMA to collect blood specimens for Quest."  (Id.)  "Upon further inquiry [] Judd became aware that the non-safety needles had been provided by Quest for blood specimen collection, that were found to constitute OSHA violations, and upon further review of the contract that Quest entered into with HMA, HMA's confidential non-public documents and its claims to Medicare, [Judd] determined particulars of the free supplies, equipment, in office test kits, and discounts that Quest provided to HMA."  (Id.)

## II.    DISCUSSION

Quest now moves to dismiss the Amended Complaint pursuant to (1) the public disclosure bar on FCA actions; and (2) Federal Rule of Civil Procedure 9(b).  Judd opposes the motion, arguing that; (1) the public disclosure bar does not apply to the claims in the Amended Complaint; (2) even if it did apply, Judd qualifies as an original source; and (3) the claims in the Amended Complaint are pled with particularity in accordance with Rule 9(b).

### A.    Quest's Motion to Dismiss

"The FCA provides penalties for persons who knowingly submit [or cause to submit] fraudulent claims to the Government."  United States ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1152 (3d Cir. 1991).  "Civil actions may be brought by the Government or, in certain circumstances, by a private plaintiff (*qui tam* plaintiff) on behalf of the Government."  Id.  "Before proceeding with the suit, the *qui tam* plaintiff must disclose the information on which the claim is based to the Government, and the Government has sixty days to intervene."  Id. (citing 31 U.S.C. § 3730(b)).  "If the Government

does not intervene, the *qui tam* plaintiff may proceed with the action unless the information on which the claim is based triggers one of the jurisdictional bars contained in section 3730(e)."  Id. (citing 31 U.S.C. § 3730(e)).

> ### i.  *The Public Disclosure Bar*

The jurisdictional bar at issue in this case is the public disclosure bar, which requires a court to withdraw its jurisdiction over a *qui tam* suit when the allegations underlying the suit were publicly disclosed in other fora.  "[T]he purpose of the public disclosure bar is to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits[.]"  United States ex rel. Zizic v. Q2Administrators, LLC, 728 F.3d 228, 235 (3d Cir. 2013) (quoting Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 295 (2010)).

> ### a.  Pre-ACA v. ACA-Amended Public Disclosure Bar

The parties dispute which version of the public disclosure bar governs the allegations in the Amended Complaint.  Before the Patient Protection and Affordable Care Act ("ACA"), Pub. L. 111–148, 124 Stat. 119, which was signed by President Obama on March 23, 2010, the public disclosure bar prevented courts from exercising "jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2006).  After the ACA went into effect, however, the public disclosure bar required courts to "dismiss an action or claim . . . unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim

were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media."  31 U.S.C. § 3730(e)(4)(A) (2010).

Thus, for purposes of this case, the ACA-amended public disclosure bar is more limited than the pre-ACA version, because the pre-ACA version encompasses allegations in both federal and state fora, while the ACA-amended version is limited to federal fora.[5]  Quest contends that the pre-ACA version governs all pre-2010 conduct set forth in the Amended Complaint.  Judd, on the other hand, argues that ACA-amended version governs the Amended Complaint because this lawsuit was originally filed after the ACA-amended public disclosure bar provision took effect.  Quest is correct.

In Graham County, the Supreme Court addressed the issue of "whether the reference to 'administrative' reports, audits, and investigations in [the pre-ACA] provision encompasses disclosures made in state and local sources as well as federal sources."  599 U.S. at 283.  In doing so, the Court noted that the ACA-amended version "makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit."  Id. at 283 n.1 (citing Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 948 (1997)).

---

[5] Another difference is that the pre-ACA version bars lawsuits that are "based upon" prior allegations, while the ACA-amended version prohibits lawsuits that set forth "substantially the same allegations or transactions" as those set forth in a prior lawsuit.  However, this difference is of no moment in comparing allegations in this case because the Court of Appeals appears to equate the "based upon" requirement in the pre-ACA version with the "substantially the same allegations or transactions" requirement in the ACA-amended version.  See United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 519 (3d Cir. 2007) ("To be 'based upon' the publicly revealed allegations or transactions the complaint need only be supported by or substantially similar to the disclosed allegations and transactions." (quotation omitted)).

In Hughes, the Court addressed whether a "1986 amendment [to the FCA] is applicable to pre–1986 conduct."  520 U.S. at 945.  The pre-1986 FCA barred *qui tam* actions "based on evidence or information the Government had when the action was brought."  Id. (quotation omitted).  The amended version, however, "pemit[ted] *qui tam* suits based on information in the Government's possession, except" as otherwise limited by the public disclosure bar.  Id. at 946 (citation omitted).

The relator argued that "[b]ecause the 1986 amendment became effective before th[e] suit was commenced, . . . it, rather than the 1982 *qui tam* provision, controls."  Id.  In rejecting this argument, the Court noted that (1) "there is a presumption against retroactive legislation" that is overcome when "Congress has clearly manifested its intent to the contrary"; and (2) "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place[.]"  Id. (quotations and citations omitted).  The Court found that "[n]othing in the 1986 amendment evidences a clear intent by Congress that it be applied retroactively, and no one suggests otherwise."  Id.  The Court further explained that the "1986 amendment eliminates a defense to a *qui tam* suit—prior disclosure to the Government—and therefore changes the substance of the existing cause of action for *qui tam* defendants by attach[ing] a new disability, in respect to transactions or considerations already past."  Id. at 948 (quotations omitted).

Similarly, in this case, applying the ACA-amended public disclosure provision to the pre-2010 conduct alleged in the Amended Complaint would eliminate a full defense to a *qui tam* suit: prior disclosure in a state forum.[6]  See Graham County, 599 U.S. at 283 n.1.  This material change in the public disclosure bar, combined with (1) the legal presumption against retroactive

---

[6] Judd maintains that the ACA-amended public disclosure provision merely "clarif[ies] the law rather than establish[es] new rights."  (Pl.'s Br. Opp. 26.)  However, as previously discussed, it is clear that the ACA-amended public disclosure bar eliminates a potential defense to a *qui tam* suit.  See Graham County, 599 U.S. at 283 n.1.

legislation; and (2) no indication that Congress intended the ACA-amended public disclosure provision be applied retroactively, strongly suggests that ACA-amended public disclosure is not retroactive.

Citing to <u>United States ex rel. Estate of Cunningham v. Millennium Labs of California</u>, 841 F. Supp. 2d 523 (D. Mass. 2012), <u>overruled in part by</u> <u>United States ex rel. Estate of Cunningham v. Millennium Labs of California</u>, 713 F.3d 662 (1st Cir. 2013), Judd contends that, even if the court finds that the ACA-amended public disclosure provision is not retroactive, that provision nonetheless applies to this case because the original Complaint was filed after the ACA-amended public disclosure provision took effect.  This contention is unavailing.

<u>Estate of Cunningham</u> concerned, among other things, the issue of whether to apply the ACA-amended public disclosure bar where the initial complaint was filed before the amendments took effect, but the amended complaint was filed afterwards.  <u>See</u> 841 F. Supp. 2d at 524-27.  The court noted the "well-established principle that jurisdiction is determined based on whether it existed at the time the plaintiff filed the original complaint," and therefore framed the issue as "whether there was jurisdiction over Relator's FCA claim under the public disclosure bar as it existed at the time Robert Cunningham filed the original *Complaint* in this suit."  <u>Id.</u> at 528, 529 (emphasis in original).  In resolving this issue, the court applied the pre-ACA public disclosure bar because that provision was in effect at the time that original complaint was filed. <u>See</u> <u>id.</u> at 529.

Judd maintains that the court "held that the date the initial complaint is filed determines whether or not the 2010 FCA amendments apply."  (Pl.'s Br. Opp. 25.)  But this is not so.[7] While the law at the time the initial Complaint may certainly play a role in determining what law

---

[7] Indeed, this precise argument was rejected in <u>Hughes</u>.  <u>See</u> 520 U.S. at 946-48.

to apply to a pleading, the critical inquiry is what the law was at the time the alleged conduct in the Complaint took place.  Indeed, as previously discussed, courts must assess "the legal effect of conduct . . . under the law that existed when the conduct took place[.]  Hughes, 520 U.S. at 946. In Estate of Cunningham, the pre-ACA public disclosure provision was in effect at both the time that the initial complaint was filed and the time that the conduct alleged in the complaint took place.  Thus, the issue of what the law was at the time of the alleged conduct was not in dispute. Here, however, the initial Complaint was filed after the ACA-amended provision took effect, while the pre-2010 conduct alleged in the Complaint occurred while the pre-ACA provision was still in place.  Therefore, because the ACA-amended provision is not retroactive, the pre-ACA provision applies to all pre-2010 conduct alleged in this case.

> b.      Pre-ACA Public Disclosure Bar as Applied to pre-2010 conduct

To determine if Judd is barred by the Pre-ACA public disclosure provision, the Court "must first assess whether [his] claim is based on publicly disclosed allegations or transactions." United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 519 (3d Cir. 2007).  "This, in turn, requires a twofold analysis.  First, [the Court must] determine whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A).  Second, [the Court must] decide whether [Judd's] complaint is based on those disclosures."  Id.  To be 'based upon' the publicly revealed allegations or transactions the complaint need only be supported by or substantially similar to the disclosed allegations and transactions."  Id. (quotation omitted).

Quest argues that that the allegations in the Amended Complaint are based upon allegations that appeared in three separate prior FCA cases: (1) United States ex rel. Urbanek, et al. v. Laboratory Corp. of America Holdings, Inc., No. 00-4863 (E.D. Pa.) ("Urbanek"), filed on September 26, 2000; (2) United States ex rel. Fair Laboratory Practices Associates v. Quest

12

Diagnostics, Incorporated, No. 05-5393 (S.D.N.Y.) ("FLPA"), filed on November 18, 2009; and
(3) California ex rel. Hunter Laboratories, LLC, et al. v. Quest Diagnostics Incorporated, No. 34-
2009-00048046 (Cal. Sup. Ct.) ("Hunter Labs"), filed on December 14, 2009.  The Court will
address each case in turn.

> 1.    The Urbanek Case

The pleadings in the Urbanek case alleged a scheme whereby Quest and others
"implemented illicit nationwide marketing schemes to induce government-funded health benefit
program referrals from, and encourage overutilization of medical procedures by physicians . . .
by repeatedly delivering free medical supplies, medical equipment, personnel and/or office
equipment to the physicians."  (Berns Decl., Ex. A ¶ 6.)  Quest provided kickbacks, in the form
of "free office equipment and medical supplies," "in exchange for ongoing revenue streams and
patient referrals."  (Id. ¶¶ 7, 29.)  "Physicians, many unaware of the illegality involved, accepted
the kickbacks, receiving free supplies and equipment in proportion to the amount of business
they generated for defendants through their referrals of laboratory testing business."  (Id. ¶ 7.)

"Some physicians receive at no cost, office equipment, such as computers, printers,
printer ribbons, and phone lines, while others received medical supplies, such as gloves, gowns,
centrifuges, alcohol swabs, and gauze speculums, spatulas, pap smear brushes and brooms, and
medical waste disposal containers and services.  In some instances, defendants pay for a
professional phlebotomist to work at a physician's office at no charge to the physician."  (Id. ¶
30.)

"Each physician was, in effect, 'paid' a fee for referring business to defendants and for
using defendants' services.  The more business that the physicians gave to defendants at the
expense of other laboratories, the more equipment and supplies they were entitled to receive

from defendants." (Id. ¶ 32.) "Physicians are not required to pay for the equipment and supplies they receive but will not receive additional equipment or supplies if they stop using defendants' laboratory testing services." (Id. ¶ 34.)

"[D]efendants knew that equipment and supplies being provided for free to physicians were being used for purposes other than providing test specimens to defendants." (Id. ¶ 58.) Furthermore, "defendants knew that the fee paid to a physician by government-funded health benefit programs includes reimbursement for supplies, such as latex gloves, speculums and other items necessary to obtain the testing specimen." (Id. ¶ 71.) "As a result, the value of defendants' kickback is doubled. Physicians avoid the cost of medical supplies and equipment and then are paid by government-funded health benefit programs for defendants' free supplies, putting additional cash into their pockets." (Id. ¶ 73.)

In addition, "defendants improperly encouraged physicians to refer lab work for patients whose insurance company did not have a relationship with a defendant. Defendants wrote-off all such work, creating an improper inducement for physicians to refer patients insured by federal health benefit programs." (Berns Decl., Ex. B. ¶ 7.) "For at least more than a decade, defendants provided unlimited medical supplies to physicians, preventing many physicians from ever having to purchase items such as alcohol swabs, band aids, cotton balls and gloves for their offices." (Id. ¶ 82.)

The allegations in the Urbanek case set forth virtually the same principal fraudulent scheme as that set forth in this case: that Quest gave physicians both free medical and office supplies to induce them to refer their patients (including those insured by Medicare and Medicaid) to Quest for diagnostic testing, which, in turn, led those providers to submit false claims to Medicare and Medicaid for many of those medical supplies.

14

Judd argues that the fraudulent scheme alleged in the <u>Urbanek</u> case differs materially from the one alleged in this case because the scheme alleged in <u>Urbanek</u> occurred from 1986 through 2001, while the scheme alleged in this case took place between 2005 and 2010. This argument is unavailing for two reasons. First, the Amended Complaint specifically alleges that Quest's scheme in this case took place "[s]ince before 2005." (Amend Compl. ¶ 4.) Second, courts have "reject[ed] the contention that a 'time, place, and manner' distinction is sufficient to escape the force of the public disclosure bar." <u>United States ex rel. Boothe v. Sun Healthcare Grp. Inc.</u>, 496 F.3d 1169, 1174 (10th Cir. 2007). Moreover, "[n]ot a single circuit has held that a *complete* identity of allegations, even as to time, place, and manner is required to implicate the public disclosure bar." <u>Id.</u> (emphasis in original); <u>see also</u> <u>Glaser v. Wound Care Consultants, Inc.</u>, 570 F.3d 907, 920 (7th Cir. 2009) ("'based upon' does not mean 'solely based upon.'" (citation omitted)).

Indeed, time, place, and manner allegations do not, in themselves, constitute the essential elements of a fraudulent scheme. Rather, they are often set forth as a means of injecting sufficient particularity into allegations of a fraudulent scheme to satisfy Rule 9(b). <u>See</u> <u>Seville Indus. Machinery Corp. v. Southmost Machinery Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984) ("Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."). Thus, allegations of different time

periods of virtually the same scheme do little to take away from their similarity under the public disclosure bar.

Judd also argues that the Amended Complaint sets forth a more expansive scheme than that set forth in Urbanek.  Specifically, Judd points to allegations in the Amended Complaint that "Quest provided kickbacks to providers in the form of free in-office Strep Test Kits and Hemacult tests, as well as discounts on the fees for diagnostic laboratory services.  The in-office test[] kits are included in the laboratory fee schedule for reimbursement by Medicare and therefore, the providers could seek reimbursement directly from the government, by submitting claims to Medicare and other federally funded programs for reimbursement of costs of test kits that were never incurred by the providers."  (Pl.'s Br. Opp. 16.)  Judd also points to allegations that Quest distributed free non-safety blood draw needles to providers for use in venipuncture procedures, in violation of OSHA.

To be sure, none of these specific allegations appears in the Urbanek case.  However, they do not alter the fundamental nature of the alleged fraud in both cases: that Quest provided free medical and office supplies to induce patient referrals for testing services.[8]  See Glaser, 570 F.3d at 920 (addition of "a few allegations . . . is not enough to take [a] case outside the jurisdictional bar.").  Thus, the fraud set forth in the Amended Complaint of providing free medical and office supplies to medical practices in exchange for patient referrals was previously disclosed publicly in the Urbanek case.[9]

2.    The FLPA Case

---

[8] The alleged OSHA violations appear to be purely incidental to the fraudulent scheme.

[9] The result is the same when applying the ACA-amended public disclosure bar to conduct in the Amended Complaint that took place in 2010 or later, as both the pre-ACA and ACA-amended provisions employ the same standard in analyzing the similarity of allegations. See Note 5.

16

The pleadings in the <u>FLPA</u> case allege a scheme whereby Quest charged "unlawful, below-cost, discounted capitated prices . . . to managed care companies . . . to induce referrals of higher-priced Federally reimbursed health care business."  (Berns Decl., Ex. D ¶ 30.)  "These unlawful discounts were and continue to be provided by Quest to large managed care purchasers of laboratory tests, in exchange for 'pull through' business, that is, the referral of Medicare and Medicaid business by the physicians affiliated with the managed care companies," resulting in an overall profit to Quest.  (<u>Id.</u>)  To implement this scheme, Quest's "corporate and regional finance offices . . . would instruct their sales force to persuade managed care clients to influence their affiliated physicians to send lucrative non-managed care laboratory Medicare and Medicaid business to the same Quest laboratory that services the physicians' managed care patients."  (<u>Id.</u> ¶ 32.)

The allegations in the <u>FLPA</u> case are not similar enough to those in the Amended Complaint in this case to trigger the public disclosure bar.  While both <u>FLPA</u> and this case allege a pull-through scheme where Quest provided discounted testing services for privately insured patients to induce referrals of federally insured patients, the manner in which the pull-through scheme was carried out in each case is materially distinct.

In this case, the Amended Complaint alleges that Quest provided discounted testing services, directly to physicians, for their privately insured patients, as an inducement for referrals of the physicians' federally insured patients.  This allowed the physicians themselves to profit by keeping the difference between the amount that Quest charges the physicians for a given test and the amount that the physician receives from the private insurers for that same test.  In contrast, the FLPA case alleges that Quest charged private insurers, not the physicians themselves, discounted rates for testing services, and that Quest officials would specifically instruct those

private insurers to persuade their physician subscribers to refer their federally insured patients to Quest for diagnostic testing.  This allowed the private insurers to profit instead of the physicians.

Thus, the <u>FLPA</u> case alleges a pull-through scheme that is fundamentally different from that alleged in the Amended Complaint.  The two schemes employ different mechanisms that cause different parties to profit.  And it simply cannot be the case that prior pull-through scheme allegations would serve to bar all future pull-through schemes.  Indeed, pull-through schemes, like other frauds, can take on varying forms with materially different elements.  Consequently, the pull-through scheme allegations in the Amended Complaint are not "based on" those in the <u>FLPA</u> case.

3.      <u>The Hunter Labs Case</u>

The pleadings in the <u>Hunter Labs</u> case allege that, "[i]n order to secure the business and referrals of . . . medical providers," Quest, among others, "offer deeply discounted prices, often below cost, for those tests paid for by the medical providers."  (Berns Decl., Ex. F ¶ 13.)  "The medical providers thereby lower their costs, and can increase their profits."  (<u>Id.</u>)  "In exchange for these discounts, the medical providers refer their Medi-Cal patients (and other patients for whom the providers do not pay) to the same lab."  (<u>Id.</u>)  "These referrals, obtained in exchange for discounts, are referred to in the industry as 'pull-through.'"  (<u>Id.</u>)

"For those lab tests conducted on Medi-Cal patients . . . [Quest] bill[s] Medi-Cal, rather than the medical provider."  (<u>Id.</u> 14.)  "When they do so, they typically bill Medi-Cal the highest amount that they charge any client."  (<u>Id.</u>)

These allegations are substantially similar to the pull-through scheme set forth in the Amended Complaint.  Both the Amended Complaint and the <u>Hunter Labs</u> case contain allegations that Quest provided discounted testing services directly to physicians for their

18

privately insured patients so that those physicians would refer more patients to Quest for diagnostic testing, including those insured by Medicare and Medicaid, thus allowing both Quest and the physicians to profit.  Therefore, the pull-through scheme alleged in the Amended Complaint was publicly disclosed in the Hunter Labs case.[10]

        c.      The Original Source Doctrine

Because the alleged fraud of free supplies for patient referrals was publicly disclosed in the Urbanek case, while the alleged pre-2010 pull-through scheme of discounted testing services of private patients for public patient referrals was publicly disclosed in the Hunter Labs case, the Court lacks subject matter jurisdiction over these frauds unless it finds that Judd was an "original source" of the information relating thereto.  31 U.S.C. § 3730(e)(4)(A).  Under the Pre-ACA public disclosure provision, "an 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  U.S.C. § 3730(e)(4)(B) (2006).

        1.      <u>Direct and Independent Knowledge</u>

Thus, "[t]o be an original source, a relator's knowledge must be both direct and independent."  Atkinson, 473 F.3d at 520 ("The FCA seeks to encourage persons with first hand knowledge of fraudulent misconduct, or those who are either close observers or otherwise involved in the fraudulent activity to come forward." (quotation omitted)).  "'Independent

---

[10] To be sure, the Hunter Labs case has no effect on conduct alleged in the Amended Complaint that took place in 2010 or later related to Quest providing discounted testing services, because, as previously discussed, substantially similar allegations in state fora do not qualify as a public disclosure under the ACA-amended public disclosure bar.  See 31 U.S.C. § 3730(e)(4)(A) (2010).  However, this is ultimately of no moment because, as discussed below, the allegations in the Amended Complaint that Quest submitted false claims for diagnostic testing of improperly referred patients fail on the merits because they do not comply with Rule 9(b).

knowledge' is knowledge that does not depend on public disclosures." Id. (citation omitted). '"Direct knowledge' is knowledge obtained without any intervening agency, instrumentality or influence: immediate." Id. (quotation omitted).

Quest argues that Judd is not an original source of the information on which the allegations in the Amended Complaint are based because Judd fails to allege that (1) he has the requisite direct and independent knowledge regarding Quest's conduct; and (2) he provided the information underlying his allegations to the Government prior to filing the original Complaint in this case.  Judd counters that he is an original source of the information on which the allegations in the Amended Complaint are based because (1) those allegations are based on his independent knowledge of his medical practice and its dealings with Quest; and (2) he voluntarily advised the Government of his claims before filing suit.

 The Amended Complaint states that, in October 2007, "Judd conducted an investigation into the relationship between HMA and Quest[,]" which "included discussions with the nurse manager and phlebotomist at HMA about non-safety needles that were being used at HMA to collect blood specimens for Quest."  (Amend. Compl. ¶ 16.)  "Upon further inquiry [] Judd became aware that [] non-safety needles had been provided by Quest for blood specimen collection [] that were found to constitute OSHA violations, and upon further review of the contract that Quest entered into with HMA, HMA's confidential non-public documents and its claims to Medicare, [Judd] determined particulars of the free supplies, equipment, in office test kits, and discounts that Quest provided to HMA."  (Id.)

Judd provides specific examples of false claims that HMA submitted to Medicare—that he discovered in the course of this investigation—for (1) the cost of non-safety needles that Quest had provided for free; (2) the cost of in-office hemacult testing kits that Quest had

provided for free; and (3) the cost of in-office streptococcus testing kits that Quest had provided

for free.  See (id. ¶¶ 127-131.)  Judd also points to specific agreements that HMA entered into

with Quest for discounted testing services and free office supplies.  See (id. ¶¶ 101-103, 106.)

These allegations are sufficient to show that Judd had direct and independent knowledge

of Quest's fraud, as it relates to HMA.  Indeed, the Amended Complaint makes clear that Judd,

as the CEO and managing partner of HMA, had direct and independent knowledge (1) that Quest

was providing HMA with free medical and office supplies and discounted testing services, and

(2) that HMA was, in turn, making false claims to Medicare and Medicaid for certain testing-

related supplies that Quest provided to HMA at no charge.

Quest argues that there is no indication that Judd had direct or independent knowledge of

information relating to the following critical allegations surrounding the fraudulent scheme set

forth in the Amended Complaint: (1) that Quest intended those free medical and office supplies

and discounted testing services to induce HMA to refer Medicare and Medicaid patients to Quest

for testing services; and (2) that these alleged kickbacks caused HMA to refer patients to Quest.

This argument is unavailing.

With respect to Judd's knowledge of Quest's intent to induce patient referrals from

HMA, there can be little doubt that Quest's provision of free medical and office supplies and

discounted testing services to HMA comes with an intent to induce patient referrals from HMA.

Indeed, the Court can see no other reason why Quest would provide such benefits to HMA.

With respect to Judd's knowledge that the kickbacks from Quest caused HMA to refer

patients to Quest, the Amended Complaint states that "Quest's offer to provide free medical and

office supplies, equipment and discounts was an important factor in [Judd's] decision to change

laboratory services from Lab Corp to Quest and to refer most of HMA's lab work to Quest and to

21

thereafter maintain HMA's relationship with Quest."  (Id. ¶ 97.)  Quest contends, most

unpersuasively, that this allegation is insufficient because Judd "does not assert that these alleged

benefits were a 'but for' or even a proximate cause of any particular referral that he made to

[Quest]."  (Def.'s Br. Opp. 25 n.14.)  This contention goes to the merits of Judd's FCA claims

and has little to do with the direct and independent knowledge requirement.[11]  The Amended

Complaint makes clear that Judd, who, as the CEO and managing partner of HMA, and as a

result of an investigation that he conducted into HMA's relationship with Quest, had direct and

independent knowledge of how HMA's receipt of free supplies and discounted testing from

Quest influenced HMA's decision to refer lab work to Quest.[12]

        Quest further argues that Judd fails to show that he had direct and independent

knowledge of "the actual submission of false claims to the Government (by QDI or otherwise

resulting from any allegedly improper referral."  (Def.'s Opp. Br. 25.)  This argument is a red

herring, as it related to false claims submitted by HMA.  HMA's submission of false claims

---

[11] Even with respect to the merits of a FCA claim, there is no "but for" or proximate cause requirement.  Rather, Judd must show that one purpose of Quest's providing free medical and office supplies and discounted testing to HMA was to induce patient referrals.  See United States v. Greber, 760 F.2d 68, 69 (3d Cir. 1985) ("[I]f one purpose of the payment was to induce future referrals, the [M]edicare statute has been violated."); United States v. Kats, 871 F.2d 105, 108 (9th Cir. 1989) (kickback payment violates the Medicare statute unless "the payment [was] wholly and not incidentally attributable to the delivery of goods or services." (quotation marks omitted)).

[12] Quest also contends that Judd fails to show any direct or independent knowledge "that the alleged provision of free supplies and discounts had any effect whatsoever on the referral practices of physicians other than himself[.]"  (Def.'s Br. Opp. 25 n.14.) (emphasis in original) This contention is persuasive, as discussed below, with respect to Judd's knowledge of patient referrals to Quest by physicians outside of HMA.  Nonetheless, the Amended Complaint shows that Judd had direct and independent knowledge of patient referrals to Quest from HMA.  See (Amend. Compl. ¶ 97.)

results not from improper referrals but rather from receipt of free supplies in order to induce improper referrals.[13]

Finally, Quest argues that Judd fails to show that he had direct and independent knowledge that "that the alleged provision of free supplies caused any physician to submit claims to the Government for the cost of such supplies."  (Id.)  However, the Amended Complaint specifically notes examples of false claims submitted by HMA for (1) the cost of non-safety needles that Quest had provided for free; (2) the cost of in-office hemacult testing kits that Quest had provided for free; and (3) the cost of in-office streptococcus testing kits that Quest had provided for free.  See (Amend. Compl. ¶¶ 127-131.)

In short, Judd has direct and independent knowledge of Quest's fraudulent scheme, as it relates to false claims submitted by HMA.  However, as Quest points out, Judd has no direct or independent knowledge of this scheme, as it relates to other medical providers.  Judd maintains that he has direct and independent knowledge that other medical providers entered into similar agreements with Quest because "Quest designed and structured the business arrangements between itself and the Providers" using "standard form contracts, order forms, price lists and oral representations to structure such business arrangements with Providers."  (Id. ¶¶ 31, 121.) "Quest presented [Judd] with standardized form agreements that were created or last revised in 6/05."[14]  (Id. ¶ 121.)

---

[13] To be sure, Quest's alleged submission of false claims stems directly from improper referrals, and, as discussed below, the Amended Complaint fails to indicate that Judd had any direct or independent knowledge of any false claims submitted by anyone outside of HMA.

[14] Judd also points to unspecified "discussions with other providers in South Eastern Pennsylvania that demonstrate the Quest's practices are not limited to HMA and they extend to other medical practices."  (Amend. Compl. ¶ 16.)  Without knowing who participated in these discussions, when and under what circumstances they occurred, and what their content was, this allegation adds nothing to show that Judd had independent and direct knowledge that Quest employed the fraudulent scheme alleged in this case with other medical providers.

That Quest may have presented HMA with standard form agreements does not necessarily mean that Quest entered into those same agreements with other providers, or that Quest, in fact, gave those providers free medical and office supplies and discounted testing services in exchange for patient referrals.  Thus, Judd's knowledge that Quest employed the scheme alleged in the Amended Complaint with providers other than HMA amounts to little more than speculation.[15]  See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 475 (2007) (a "prediction . . . does not qualify as 'direct and independent knowledge.'").

Citing to Atkinson, Judd argues that the Court should allow Judd to qualify as an original source of information regarding Quest's alleged kickback scheme with other providers because "a relator need not possess direct knowledge of every allegation that is pled to qualify as an original source."  (Def.'s Br. Opp. 37.)  In Atkinson, the Court of Appeals "refused to adopt a bright-line rule always disqualifying relators as an original source when part of the basis of their information is consultation of public records."  473 F.3d at 522 (citation omitted).  The Court ruled that "in deciding whether a relator's reliance on public records bars him from being an original source under § 3730(e)(4)(B), courts should consider both the availability of the

---

[15] Judd also lacks any direct or independent knowledge of the allegation that "Quest provided claims to Medicare for payment of the diagnostic laboratory testing it provided for each of the patients whose [patient ID] was identified on the claims for venipuncture services made by HMA . . . on or about the same date that HMA provided venipuncture services to those patients." (Amend. Compl. ¶ 127.)  Quest basis this allegation on the fact that "[e]ach of the claims for [] venipuncture services that were submitted by HMA to Medicare . . . were from patients whose blood specimen was delivered by HMA to Quest for diagnostic laboratory testing, following which Quest provided to HMA the laboratory testing results for the patients identified on the HMA claims." (Id.)  This does not amount to direct knowledge of any false claims made by Quest for those tests.  Indeed, as the Amended Complaint admits, the allegation that Quest made one or more false claims is based purely "[u]pon on information and belief."  (Id.)

information and the amount of labor and deduction required to construct the claim." <u>Id.</u>
(quotation omitted).

The Court fails to see how this ruling aids Judd's position, as there is no indication in the
Amended Complaint that Judd relied on any public records in setting forth his claims.
Consequently, Judd's direct and independent knowledge of the fraudulent scheme alleged in the
Amended Complaint is limited to that surrounding false claims submitted by HMA.

### 3.   Disclosure to the Government

The Amended Complaint states that Judd "voluntarily provided notice of this action to
the government before filing this *qui tam* action." (Amend. Compl. ¶ 16.)  Specifically, Judd
"previously provided to the Attorney General of the United States and the United States Attorney
for the District of New Jersey a disclosure statement summarizing known material evidence and
information related to the Complaint." (<u>Id.</u>)  He also "provided a relator statement to the
Government at the time he served the initial Complaint upon the Government Plaintiffs." (<u>Id.</u> ¶
17.)

Quest argues that these allegations fail to show that Judd provided sufficient prior
disclosure to the Government, in accordance with 31 U.S.C. § 3730(4)(B), because "he has not
alleged that he provided the information on which his allegations are based to the Government
prior to the filing of the instant action." (Def.'s Br. Opp. 27.)  This argument is hyper-technical
and unavailing.  The Court fails to see any material difference between providing a "statement
summarizing known material evidence and information related to the Complaint" and providing
"information upon which [Judd's] allegations are based."  Thus, Judd qualifies as an original
source regarding only allegations related to false claims submitted by HMA.  In turn, he is
prevented, under the public disclosure bar, from pursuing allegations relating to (1) both pre and

post-2010 false claims submitted by other medical providers or Quest arising out of the principal

fraud of free medical and office supplies for patient referrals; and (2) Quest's providing

discounted testing services, pre-2010, to induce patient referrals.[16]

### ii.    Rule 9(b)

Because the public disclosure bar does not apply to the allegations in the Amended

Complaint, as they relate to (1) false claims submitted by HMA; and (2) Quest's providing

discounted testing services, post-2010, to induce patient referral, the Court will address the

merits of Judd's FCA claims.  "[A] prima facie claim under the FCA requires that the plaintiff

show that (1) the defendant presented or caused to be presented to an agent of the United States a

claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim

was false or fraudulent."  United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295,

311-12 (3d Cir. 2011) (quotation omitted).  "[P]laintiffs must plead FCA claims with

particularity in accordance with Rule 9(b)."  Id. 302 n.9 (citing United States ex rel. LaCorte v.

SmithKline Beecham Clinical Labs., 149 F.3d 227, 234 (3d Cir.1998)).

In general, as previously discussed, "Rule 9(b) requires plaintiffs to plead with

particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of

the precise misconduct with which they are charged, and to safeguard defendants against

spurious charges of immoral and fraudulent behavior.  It is certainly true that allegations of 'date,

place or time' fulfill these functions, but nothing in the rule requires them.  Plaintiffs are free to

---

[16] The public disclosure bar also applies to Judd's state law claims relating to (1) both pre
and post-2010 false claims submitted by other medical providers or Quest, arising out of the
alleged fraud of free medical and office supplies for patient referrals; and (2) Quest's alleged
pre-2010 pull-through scheme of providing discounted testing services in exchange for patient
referrals.  Because the Court lacks original jurisdiction over Judd's federal FCA claims relating
to the above, it lacks supplemental jurisdiction over Judd's state FCA claims relating to same.
See 28 U.S.C. § 1367(a).

use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Seville Indus., 742 F.2d at 791.

Quest argues that the Amended Complaint fails to meet the particularity requirements of Rule 9(b) because it does not (1) identify specific patient referrals to Quest for specific tests that were induced by a physician's receipt of free supplies or discounts on testing services; and (2) detail specific false claims, submitted by either Quest or a physician, to the Government arising out of specific improper referrals. Judd counters that (1) Rule 9(b) does not necessarily require identifying specific false claims submitted to the Government at the pleading stage; and (2) a prima facie FCA claim does not require a showing of causation.

Judd's position that Rule 9(b) does not require an FCA pleading to identify the details of one or more specific false claims is correct. While the Court of Appeals "has suggested that a heightened standard applies to False Claims Act complaints, it has not yet defined that standard." United States ex rel. Underwood v. Genentech, Inc., 720 F. Supp. 2d 671, 676 (E.D. Pa. 2010) (citing United States ex rel. St. John LaCorte v. SmithKline Beecham Clinical Lab., 149 F.3d 227, 234 (3d Cir. 1998).[17]

Quest points to a number courts of appeal that require allegations identifying the details of specific false claims, see United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006); United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 223 (1st Cir. 2004), abrogated on other grounds by Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662 (2008); United States ex rel. Clausen v. Lab. Corp. of Am. Inc., 290 F.3d 1301, 1312 (11th Cir. 2002), as well as courts within this Circuit requiring the same, see

---

[17] In Wilkins, the Court of Appeals reiterated that it was still an open question "whether a plaintiff, at the pleading stage, must identify representative examples of specific false claims that a defendant made to the Government in order to plead an FCA claim properly is a requirement under the more particular pleading standards of Rule 9(b)." 659 F.3d at 308.

United States ex rel. Piacentile v. Sanofi Synthelabo, Inc., No. 05-2927 2010 WL 5466043, at *8 (D.N.J. Dec. 30, 2010); United States ex rel. Schmidt v. Zimmer, Inc., No. 00-1044, 2005 WL 1806502, at *1 (E.D. Pa. July 29, 2005)).

   At the same time, Judd points to other courts of appeal that disagree with such a requirement, see Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998-99 (9th Cir. 2010); United States ex rel. Grubbs v. Ravikumar Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009); United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854-55 (7th Cir. 2009), as well as courts within this Circuit expressing disagreement, see Underwood, 720 F. Supp. 2d at 676-77; United States ex rel. Singh v. Bradford Reg'l Med. Ctr., No. 04–186, 2006 WL 2642518 (W.D. Pa. Sept. 13, 2006); United States ex rel. Landsberg v. Levinson, No. 03–1429, 2006 WL 6936820 (W.D. Pa. Feb. 13, 2006); Gibbons ex rel. United States v. Kvaerner Phila. Shipyard, Inc., No. 05–685, 2006 WL 328362 (E.D. Pa. Feb. 10, 2006).

   In the absence of wisdom from the Court of Appeals, the Court adopts the reasoning of Grubbs, 565 F.3d at 190 ("[A] plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted.  To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates."), and Ebeid, 616 F.3d at 998-99 ("[U]se of representative examples is simply one means of meeting the pleading obligation . . . . [I]t is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." (quotation omitted)).

   Indeed, to in all cases require that a *qui tam* plaintiff identify details of specific false claims would violate the Court of Appeals' somewhat flexible pleading standard under Rule 9(b)

that allows for varying "means of injecting precision and some measure of substantiation into . . . allegations of fraud." Seville, 742 F.2d at 791. It would further violate the Court of Appeals' allowance for relaxing Rule 9(b) "when factual information is peculiarly within the defendant's knowledge or control." In re Craftmatic Secs. Litig., 890 F.2d 628, 645 (3d Cir. 1989) (citations omitted) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." (citation omitted)).

On the other hand, Judd's contention that a prima facie FCA claim never requires a showing of causation is erroneous. As previously discussed, a prima facie case under the FCA requires a showing that "the defendant presented or caused to be presented" a false claim to the Government. Wilkins, 659 F.3d at 311. Here, Judd alleges a scheme under which, among other things, Quest, through the provision of free medical supplies, caused HMA and other providers to submit false claims for those supplies to Medicare and Medicaid. Therefore, Judd must allege this causal link in accordance with Rule 9(b). Judd must also sufficiently allege that Quest's provision of free medical and office supplies and discounted testing services caused HMA to refer its patients to Quest for testing services.[18]

Here, the Amended Complaint satisfies Rule 9(b), as it relates to false claims submitted by HMA to Medicare for (1) venipuncture services using needles that Quest provided at no cost; (2) in-office hemacult testing using hemacult testing kits that Quest provided at no cost; and (3) in-office streptococcus testing using streptococcus testing kids that Quest provided at no cost.

---

[18] Judd's allegation that "Quest's offer to provide free medical and office supplies, equipment and discounts was an important factor in [his] decision to change laboratory services from Lab Corp to Quest and to refer most of HMA's lab work to Quest and to thereafter maintain HMA's relationship with Quest[,]" (Amend. Compl. ¶ 97), is sufficient to show that Quest's provision of free medical and office supplies and discounted testing services caused HMA to refer its patients to Quest for testing services. See Note 5.

The Amended Complaint provides representative examples of these false claims that include (1) the specific items for which HMA billed Medicare; (2) the manner in which HMA billed Medicare; (3) the service dates; (4) patient ID numbers; and (5) the date and amount of reimbursement from Medicare.  <u>See</u> (Amend. Compl. ¶¶ 125-131.)  These examples satisfy Rule 9(b).[19]

Quest's arguments that Judd must tie (1) specific improper patient referrals to Quest with specific free supplies or discounts on testing services that Quest provided to HMA; and (2) those specific improper referrals with specific false claims, in order to satisfy Rule 9(b), are unavailing, to the extent that these arguments relate to false claims submitted by HMA.  The fraudulent scheme alleged in the Amended Complaint in no way requires that HMA use the free medical supplies that it receives from Quest in conjunction with specific patients that HMA referred to Quest.  And whether HMA submits a claim to Medicare for an item that Quest provided for free in conjunction with a patient that was improperly referred to Quest or elsewhere, that claim remains false.

However, Quest's arguments are persuasive, to the extent they relate to Judd's allegations regarding false claims submitted by Quest.  To be sure, as previously discussed, Judd is prevented under the public disclosure bar from pursuing such allegations relating to pre-2010 conduct.  However, to the extent there is any residual FCA claim premised on false claims submitted by Quest in 2010 or later, such a claim fails to comport with Rule 9(b).

---

[19] To be sure, the Amended Complaint provides no specific indicia of false claims that were submitted by medical providers other than HMA.  Thus, even if Judd were able to overcome the public disclosure bar with respect to those other providers, which, as previously discussed, he is not, his FCA claims, as they relate to those other providers, fail to satisfy Rule 9(b).

Indeed, the Amended Complaint fails to allege with any specificity or reliable indicia that Quest submitted false claims for testing services for patients that were referred by HMA or any other provider.  The only relevant allegation states that, "[u]pon information and belief, Quest provided claims to Medicare for payment of the diagnostic laboratory testing it provided for each of the patients whose [patient ID] was identified on the claims for venipuncture services made by HMA . . . on or about the same date that HMA provided venipuncture services on those patients[.]"  (Amend. Compl. ¶ 127.)  This information and belief is based upon the fact that "[e]ach of the claims for [] venipuncture services that were submitted by HMA to Medicare . . . were from patients whose blood specimen was delivered by HMA to Quest for diagnostic laboratory testing, following which Quest provided to HMA the laboratory testing results for the patients identified on the HMA claims."  (Id.)

"[A]llegations based on information and belief do not satisfy Rule 9(b) unless the complaint sets forth the facts upon which the belief is founded."  Zavala v. Wal-Mart Stores, Inc., 393 F. Supp. 2d 295, 313 (D.N.J. 2005).  That HMA delivered blood samples to Quest for testing and then received testing results for those samples from Quest at most leads to an assumption that Quest submitted false claims for testing of those samples.  See Clausen, 290 F.3d at 1312 n. 21 ("We cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of specificity[.]").  Consequently, Judd's federal and state FCA claims regarding Quest's submission of false claims are dismissed with prejudice.[20]

---

[20] The Court will not grant Judd leave to amend his allegations surround Quest's submission of false claims.  Judd has already filed an Amended Complaint in this action, and there is no indication that, if granted leave to amend, that Judd will be able to set forth further allegations, in good faith, suggesting that Quest submitted false claims.  See In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (futility as a ground to deny leave to replead in accordance with Rule 9(b)).

## III.  CONCLUSION

For the foregoing reasons, Quest's Motion to Dismiss is DENIED with respect to allegations of false claims submitted by HMA, but GRANTED in all other respects.  Judd may pursue his federal FCA claims and analogous state claims only as they relate to HMA's submission of false claims.  Judd's federal FCA claims and analogous state claims, as they relate to false claims submitted by anyone other than HMA, are dismissed with prejudice.

The Court will enter an order implementing this opinion.


  /s/ **Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: May 30, 2014